Submitted May 28, 2015, affirmed October 26, 2016, petition for review allowed January 13, 2017 (360 Or 752)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ROBERT LEWIS HENLEY,
aka Sonny Henley,
*Defendant-Appellant.*

Malheur County Circuit Court
09072338C; A154810

386 P3d 126

Peter Gartlan, Chief Defender, and Mary M. Reese, Deputy Public Defender, Office of Public Defense Services, filed the brief for the appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Ryan Kahn, Assistant Attorney General, filed the brief for respondent.

Before Armstrong, Presiding Judge, and Egan, Judge, and DeHoog, Judge.

**EGAN, J.**

Defendant appeals a judgment of conviction for sexual abuse in the first degree, ORS 163.427, and attempted sodomy in the first degree, ORS 163.405, for engaging in sexual behavior with the victim, his 11-year-old stepdaughter. On appeal, defendant assigns error to the trial court's admission of testimony that defendant's act of massaging the victim's chest, which occurred sometime before the sexual abuse, could constitute sexual "grooming." Defendant argues that the court erred because the witness who testified about the grooming was not a qualified expert and because the state failed to lay a scientific foundation for the admission of that evidence under *State v. Brown*, 297 Or 404, 687 P2d 751 (1984), and *State v. O'Key*, 321 Or 285, 899 P2d 663 (1995). Defendant argues further that the testimony should have been excluded because it was not relevant under OEC 401 or unduly prejudicial under OEC 403. Defendant also assigns error to the court's imposition of consecutive sentences, which we reject without discussion. We write to discuss only defendant's challenges to the court's admission of the grooming evidence and conclude that the court did not err in admitting the evidence. We therefore affirm.

Because the jury found defendant guilty, we state the facts in the light most favorable to the state. *State v. Johnson*, 342 Or 596, 598, 157 P3d 198 (2007). Defendant is the stepfather of the victim, M. He married M's mother when M was two years old. M lived with her mother and defendant in Idaho, and spent every other weekend with her father and stepmother, also in Idaho.

When M was five or six years old, defendant was with M in her bedroom, and he asked her to touch his penis. M did not comply with defendant's request. Instead, she told him that she needed to go to the bathroom and then went to find her mother. M's mother confronted defendant, who admitted to sleeping in M's bed but stated that he "didn't know" about M's allegation. M's mother told M that defendant would never go in her room again and that M could sleep in her mother's bed for the rest of the night.

"Once in a while," M asked defendant to give her massages. He would massage her shoulders, legs, and chest

area. M did not like it when defendant would massage her chest because she "thought he was going too far into [her] other areas." When M told her mother about the massages, her mother said that defendant probably did not mean anything by it because he gave her massages like that all the time.

In June 2009, when M was 11 years old, she went on a camping trip with defendant, her mother, her siblings, and defendant's friend, all of whom stayed in a trailer. M slept on a mattress in the middle of the trailer, next to her mother and defendant, who slept in a fold-out bed on the side of the trailer. M fell asleep, but she awoke in the middle of the night when defendant laid down next to her on her mattress. Defendant did not do anything but lie there, and M eventually fell back to sleep.

In the early morning hours, M woke up and felt defendant touching her. He had pulled his pants down and pulled M's pants and underwear to her ankles, and he was placing his fingers in her vagina. M rolled over to try and stop defendant from touching her. Defendant then placed his hands on M's sides, attempted to spread her buttocks with his thumbs, and placed his penis on her buttocks and between her "butt cheeks." Defendant did not penetrate M's anus. He ejaculated and said, "Ahh."

Afterwards, M sat up, and defendant asked her if she was okay. M lied to defendant, telling him that she was not tired. When M's mother woke up, defendant laid back down on the bed. M's mother asked M if anything was wrong. M replied, "No." Her mother then asked her to lie down next to her. M's mother testified that defendant was asleep on M's bed at that time.

M told her mother about what had happened later that afternoon, and M's mother responded by telling M that she "didn't know what to say" and that she would arrange the mattresses so that defendant could not get into bed with M. M's mother confronted defendant about M's allegations, and he stated that he did not know what had happened because he had been asleep. Later that afternoon, M, defendant, and others went rock hunting.

After the camping trip ended, M went to live with her father and stepmother for a month, in accordance with a previous plan. She did not disclose the abuse right away, but eventually told her stepmother and father what had happened on the camping trip. M's father reported the abuse to the police, who initiated an investigation.

On June 25, 2009, M was interviewed by Courtney Palfreyman, a forensic interviewer with Children At Risk Evaluation Services (CARES) at St. Luke's Hospital in Boise, Idaho. Palfreyman has both a bachelor's degree and a master's degree in social work, has had special training in forensic interviewing, and has over 10 years of experience working in child protection.[1] During the interview, M told Palfreyman about the incident when she was five or six years old as well as what had happened on the camping trip. M also described defendant's massages to Palfreyman, stating that he "goes all over" and indicating her chest area. M told Palfreyman about one occasion when M asked defendant to give her a neck massage, but he instead massaged her upper chest. When M asked defendant to stop, he massaged the area above and below her buttocks.

At trial, Palfreyman testified generally about the concept of sexual grooming. She explained that grooming can be used by abusers to "build trust and weaken the defenses of a child." She explained that grooming can consist of behaviors such as spending time with a child, allowing a child to do things that the child's parents would not allow, giving a child money, tickling a child, or massaging a child. When Palfreyman was asked whether, during her interview with M, she identified "any behavior which could be considered grooming," Palfreyman replied, "Um, when she just talked about the massaging where she wanted it on her neck but he would go lower into her chest area."

During cross-examination, Palfreyman clarified that whether behavior can be considered grooming depends on the motives of the adult. For instance, typical parental behavior can constitute grooming if it is done with "evil intent."

---

[1] Palfreyman's qualifications are discussed in greater detail at 281 Or App at 830-31.

Palfreyman explained that, "as an outsider looking to build trust and weaken defenses; if that's [the] motive for getting into [the] child's circle of trust, then that could be potential grooming." Palfreyman acknowledged that she had not spoken to defendant and did not know what his motives were.

Defendant was convicted of first-degree sexual abuse and attempted first-degree sodomy. He now appeals, challenging the trial court's admission of Palfreyman's testimony about grooming.

In his first assignment of error, defendant contends that the trial court erred when it overruled defendant's objection to Palfreyman's qualifications as an expert on the topic of sexual grooming. In his second assignment of error, defendant claims that the trial court erred when it admitted the grooming testimony without a proper foundation. Specifically, he argues that the testimony constituted scientific evidence and that the state failed to demonstrate the scientific validity of the concept of sexual grooming. Defendant argues further that Palfreyman's testimony should have been excluded under OEC 401 because it was irrelevant or, alternatively, that it should have been excluded under OEC 403 because the probative value of the evidence was substantially outweighed by the danger of unfair prejudice.

We begin with defendant's challenge to Palfreyman's qualifications to testify on the subject of grooming. At the outset, we reject the state's argument that defendant's claim is unpreserved for appellate review. "Preservation requirements serve a practical purpose, that is, to advance goals such as ensuring that the positions of the parties are presented clearly to the initial tribunal and that parties are not taken by surprise, misled, or denied opportunities to meet an argument." *State v. Ohotto*, 261 Or App 70, 73, 323 P3d 306 (2014) (internal quotation marks omitted).

Here, when the prosecutor asked Palfreyman if she had "any training regarding a concept called grooming," defense counsel immediately objected to the question, stating, "I would object to her being asked to testify as an expert on this issue." The prosecutor clarified that he was not trying to qualify Palfreyman as a psychologist or "expert in the field of grooming," and Palfreyman testified that she was

not, in fact, a psychologist. Defense counsel again objected, this time arguing that the state had failed to lay a proper foundation for "this kind of testimony" and that Palfreyman was not an expert and did not have special training with regard to grooming.

Then, outside of the presence of the jury, the court asked the prosecutor to clarify whether he intended to qualify Palfreyman as an expert witness. The prosecutor explained:

> "Essentially, Your Honor, what I plan on asking her is just laying a foundation that through her trainings and experiences and through doing 600 of these interviews, she's been taught to recognize certain behaviors which could be considered grooming."

The court admitted the testimony about grooming, with the understanding that Palfreyman "would not be able to testify that she's interviewed this child, saw signs of grooming and therefore [formed a] medical diagnosis the child's been sexually abused." Rather, Palfreyman would be permitted to "define what grooming is, [and] what behaviors concerned her." Defense counsel was granted a continuing objection to the admission of the testimony.

Defense counsel's objections to Palfreyman's testimony about grooming resulted in a thorough colloquy between the prosecutor and the court about the purpose of the testimony. The court ultimately ruled that Palfreyman was qualified to provide the jury with limited testimony about the concept of grooming. Neither the parties, nor the court, were surprised, misled, or denied the opportunity to meet defendant's argument. Thus, defendant's claim is preserved for appellate review. *Ohotto*, 261 Or App at 73.

However, on review of that claim for legal error, *State v. Dunning*, 245 Or App 582, 588-91, 263 P3d 372 (2011), we conclude that the trial court did not err in admitting Palfreyman's testimony about grooming. Palfreyman testified that she received a bachelor's degree and a master's degree in social work, and that she received special training in forensic interviewing, which included training on the concept of grooming. In addition to her training, Palfreyman

testified that she had over 10 years of experience working in child protection, with CARES and with the State of Idaho. She stated that, as of September 30, 2009, she had completed 604 forensic interviews of children. When asked to explain the concept of grooming, Palfreyman indicated that she was familiar with certain activities that, depending on the motives of the actor, might constitute grooming.

We conclude that Palfreyman's training and experience provided her with specialized knowledge on the topic of grooming, which is not a subject area within the average person's common knowledge. Her testimony about grooming was helpful to assist the jury in understanding defendant's behavior leading up to the camping trip. It was therefore admissible as expert testimony under OEC 702,[2] and the trial court did not err in permitting Palfreyman to testify generally about sexual grooming.

We turn to defendant's contention that the state failed to lay a proper foundation for Palfreyman's grooming testimony under *Brown* and *O'Key*, which we review for legal error. *Jennings v. Baxter Healthcare Corp.*, 331 Or 285, 299-301, 14 P3d 596 (2000). The threshold question in this case is whether Palfreyman's testimony constitutes "scientific" evidence, thereby requiring the state to lay a *Brown/O'Key* foundation.[3] In *Brown*, the Supreme Court concluded that

---

[2] OEC 702 provides:

"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

[3] In *Brown*, the court identified seven primary factors to consider in determining whether a party has laid a proper foundation for the admissibility of scientific evidence: (1) the technique's general acceptance in the field; (2) the expert's qualifications and stature; (3) the use that has been made of the technique; (4) the potential rate of error; (5) the existence of specialized literature; (6) the novelty of the invention; and (7) the extent to which the technique relies on the subjective interpretation of the expert. 297 Or at 417.

In *O'Key*, the court added four more factors to consider: (1) whether the theory or technique can be, and has been, tested; (2) whether the theory or technique has been subject to peer review or publication; (3) the known or potential rate of error; and (4) the degree of acceptance of the theory or technique in the relevant scientific community. 321 Or at 303-04. Those lists are nonexclusive, and the court has stressed that the "key to admissibility" is the "validity of a particular scientific theory or technique." *Id.* at 306.

"[t]he term 'scientific' *** refers to evidence that draws its convincing force from some principle of science, mathematics and the like. Typically, but not necessarily, scientific evidence is presented by an expert witness who can explain data or test results and, if necessary, explain the scientific principles which are said to give the evidence its reliability or accuracy."

297 Or at 407-08. The Supreme Court elaborated on the meaning of scientific evidence in *O'Key*. In that case, the court drew a distinction between scientific evidence and other specialized knowledge that requires expert testimony, stating that, although "it is difficult to set a more definitive boundary between 'scientific' evidence and 'technical or other specialized knowledge,'" such a distinction exists. 321 Or at 291. The court then adopted the United States Supreme Court's analysis of the term "scientific" as it related to FRE 702, which parallels OEC 702:

"In [*Daubert v. Merrell Dow Pharmaceuticals*, 509 US 579, 113 S Ct 2786, 125 L Ed 2d 469 (1993)], the Supreme Court emphasized that under FRE 702, which is identical to OEC 702, 'the subject of an expert's testimony must be "scientific *** knowledge."' [*Id*. at 589-90.] According to the Supreme Court, the adjective 'scientific' 'implies a grounding in the methods and procedures of science,' and 'knowledge' means ideas inferred from known facts or 'accepted as truths on good grounds.' [*Id*.] '[T]o qualify as "scientific knowledge" [within the meaning of FRE 702], an inference or assertion must be derived by the scientific method.' *Id*. The scientific method is a validation technique, consisting of the formulation of hypotheses, followed by observation or experimentation to test the hypotheses. [*Id*. at 592-93.] Whenever a litigant claims that a particular scientific technique or theory is valid, that claim is a hypothesis requiring empirical verification. *Id*."

*O'Key*, 321 Or at 292-93 (fourth and fifth brackets in *O'Key*.)

After *Brown* and *O'Key*, the Supreme Court emphasized that the key factor in determining whether evidence is "scientific" is whether it would be perceived by the trier of fact to be scientific. "Evidence perceived by lay jurors to be scientific in nature possesses an unusually high degree of persuasive power." *O'Key*, 321 Or at 291. Thus, "a court

must determine whether the expert's assertions 'possess significantly increased potential to influence the trier of fact as scientific assertions.'" *State v. Marrington*, 335 Or 555, 562, 73 P3d 911 (2003) (quoting *O'Key*, 321 Or at 292). In *Marrington*, the court held that an expert's testimony regarding a child's delay in reporting sexual abuse would be perceived as scientific evidence by a trier of fact, and thus required a foundational showing of scientific validity before its admissibility. 335 Or at 563-64. The court explained:

> "An expert * * * who has a background in behavioral sciences and who claims that her knowledge is based on studies, research, and the literature in the field, announces to the factfinder that the basis of her testimony is 'scientific,' *i.e.*, is grounded on conclusions that have been reached through application of a scientific method to collected data. Because that is how the factfinder would understand it, a court has a duty to ensure that such information possesses the necessary indices of scientific validity."

*Id.*; *see also State v. Wilson*, 266 Or App 286, 297, 337 P3d 948 (2014) (officer's testimony that dilated pupils and red, puffy eyes were associated with marijuana use would not be perceived as scientific evidence by a factfinder because the testimony "did not purport to draw its convincing force from principles of science; rather it drew its force from [the officer's] training and experience" (internal quotation marks omitted)).[4]

We conclude that Palfreyman's testimony in this case did not purport to draw its convincing force from principles of science. Rather, it was derived from her training and experience as a forensic interviewer of child sexual

---

[4] The state relies, in part, on *State v. Stafford*, 157 Or App 445, 972 P2d 47 (1998), *rev den*, 329 Or 358 (1999), in which a plurality of this court held that grooming testimony was nonscientific because it was based on the expert's personal observations rather than psychological testing or other scientific methodology. However, *Stafford* is unhelpful to our analysis. First, *Stafford* was an *en banc* decision that left this court deeply divided. *See State v. Hites-Clabaugh*, 251 Or App 255, 259 n 1, 283 P3d 402 (2012) (noting that "whether or not a scientific foundation needed to be laid for this type of expert testimony * * * evenly divided this court in *State v. Stafford*"). Second, the Supreme Court's post-*Stafford* cases make clear that the primary focus of whether evidence is scientific is the perception of that evidence by the trier of fact, not whether the testimony is based on personal observations rather than scientific testing. *See Marrington*, 335 Or at 563-64; *State v. Perry*, 347 Or 110, 120-21, 218 P3d 95 (2009).

abuse victims. Palfreyman explained to the jury that she is not a psychologist and that her job is to serve as a "neutral fact finder" to discern what, if anything, has happened to a child. Although she provided the jury with limited testimony about the concept of sexual grooming, she did not offer an explanation as to any psychological bases that may underlie that concept. Palfreyman did not reference any studies, research, or literature discussing sexual grooming so as to fortify her explanation. Instead, she testified that, based on what she had learned during her training and experience as a forensic interviewer, which included over 600 interviews of children related to abuse, she was aware of certain behaviors—including giving children massages—that could constitute sexual grooming. Ultimately, Palfreyman did not give an opinion as to whether defendant's behavior toward M was, in fact, sexual grooming; she merely indicated that, depending on his motives, defendant's massages might be considered grooming. Although there may be circumstances where expert testimony about sexual grooming purports to draw its convincing force from principles of science, that is not the case here. Rather, Palfreyman made clear to the jury that her knowledge of the concept of sexual grooming was derived from her training and work experience as a forensic interviewer and not from psychological principles. *Wilson*, 266 Or App at 297. Thus, Palfreyman's testimony does not constitute evidence that would be perceived as scientific by the jury, and no foundation was required under *Brown* and *O'Key*.

As to defendant's claim that Palfreyman's testimony about grooming was irrelevant under OEC 401[5] or unduly prejudicial under OEC 403,[6] we conclude that defendant's contentions are unpreserved. At no time during the trial did defendant object to the admission of Palfreyman's testimony

---

[5] OEC 401 provides:

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

[6] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

on the basis that it was irrelevant. Defendant did not cite OEC 401 or any cases analyzing the relevancy of grooming evidence. As a result, the state did not have a meaningful opportunity to meet defendant's current argument by demonstrating the probative value of Palfreyman's testimony. And, the court did not have a meaningful opportunity to make a ruling regarding the relevancy of the testimony.

Likewise, defendant failed to preserve his claim that the evidence was unduly prejudicial and should have been excluded under OEC 403. At trial, defendant's primary objection to the admission of Palfreyman's testimony was that it lacked scientific validity. Defense counsel argued:

> "This is almost like, um, abused person syndrome, those kinds of syndromes that the state intends to use to indicate that things happened in this—this is the way things are and these are some of the things that I've seen in this case and therefore because these are here this must—he must have been grooming her. It's similar like to that—the [Supreme Court] just recently decided, [*State v. Southard*, 347 Or 127, 218 P3d 104 (2009),] which I provided the court a copy of in conjunction with my motion *in limine* regarding the sexual abuse syndrome. They talk about the standards that need to be established before those kind of propensity evidences [are] admitted. There has to be some sort of scientific validity to this issue of grooming and there isn't anything about that in this case. I think it's far, far too close; it's far too prejudicial and there isn't any validity to it."

Although counsel made a passing reference to the testimony being unduly prejudicial, he did so in the context of an argument over the scientific validity of grooming testimony. In response, the court focused entirely on defendant's argument that grooming testimony should be treated as scientific evidence, akin to testimony about sexual abuse syndrome. Because counsel did not argue that the evidence should be excluded under OEC 403 as unduly prejudicial, the court did not engage in OEC 403 balancing. Ultimately, defendant never objected to the admission of the evidence on the basis that the probative value of the testimony was outweighed by the danger of unfair prejudice. Thus, defendant's OEC 401 and 403 arguments are unpreserved for appellate review. *See State v. Montez*, 324 Or 343, 356, 927 P2d 64

(1996) (the defendant's failure to object to testimony on the grounds of relevance or undue prejudice rendered his OEC 401 and OEC 403 arguments unpreserved); *see also State v. Isom*, 313 Or 391, 406, 837 P2d 491 (1992) (an objection on one basis is insufficient to preserve objections on other grounds).

In sum, each of defendant's challenges to the admissibility of Palfreyman's testimony on grooming is unavailing. Palfreyman was qualified, under OEC 702, to present the jury with general testimony about the concept of sexual grooming, and that testimony did not constitute scientific evidence requiring a foundation under *Brown* and *O'Key*. Furthermore, defendant did not preserve his contentions that the evidence was irrelevant, or unduly prejudicial, and we decline to review defendant's unpreserved claims. Thus, the trial court did not err in admitting the challenged testimony.

Affirmed.