Argued and submitted April 6, reversed and remanded September 21, 2011

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## DONNA CAROL DUNNING,
*Defendant-Appellant.*

Wallowa County Circuit Court
07012099; A141552

263 P3d 372

Wes Williams argued the cause for appellant. With him on the brief was Jennifer Schemm.

Gregory Rios, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

SCHUMAN, P. J.

## SCHUMAN, P. J.

This criminal case from Wallowa County began as a dispute over cattle and ended with two people shot dead and another, defendant, convicted of attempted murder, ORS 161.405, and assault in the second degree, ORS 163.175. On appeal, she raises three assignments of error. First, she argues that the trial court erred in refusing to allow her to impeach the state's witness, Travis Beach, whose father was shot and killed by defendant's companion and who, in return, shot that companion, by questioning the witness about his probationary status. Second, she argues that the trial court erred in allowing a police officer to testify as an expert on memory recall after traumatic events, in order to explain why Travis's[1] account of the events changed, to his advantage and defendant's disadvantage, between the day of the incident itself and five days later. Finally, defendant assigns error to the trial court's denial of her request to cross-examine Travis on his criminal record. We conclude that the court erred in allowing the officer to testify as an expert. Consequently, we reverse and remand.

Because the jury returned guilty verdicts, we state the facts in the light most favorable to the state, *State v. Johnson*, 342 Or 596, 598, 157 P3d 198 (2007), *cert den*, 552 US 1113 (2008), although, as described below, key facts were vigorously disputed at trial. In January of 2007, Dennis Beach and his son, Travis, learned that two of their cows, as well as two cows that they had been caring for, had wandered onto property owned by Dennis's cousin. Dennis and Travis made arrangements with Shane Huntsman to retrieve the cows. Huntsman was feeding livestock on the property while the owners were out of town.

Dennis and Travis went to the ranch to collect their cows. As they were rounding up the last of them on horseback, Huntsman and defendant arrived in a pickup truck. Huntsman told Dennis and Travis that they could take their own two cows, but they had to leave the other two. Dennis and Travis ignored Huntsman and began herding away all four.

---

[1] For clarity, we refer to the members of the Beach family by their first names.

As they were doing so, Travis saw Huntsman and defendant talking in the distance and, shortly thereafter, saw Huntsman approaching with a rifle. Huntsman ordered Travis to get on his knees, and Travis obeyed. Dennis, still on his horse, rode up to Huntsman and told him that they would leave without the cows. Huntsman ordered Dennis to get off his horse and kneel next to his son. Dennis repeated that they would leave without the cows. Huntsman again warned Dennis, telling him that this was his last chance. When Dennis did not dismount, Huntsman shot him. He fell off his horse and died on the spot.

Travis then jumped up and rushed towards Huntsman, trying to gain control of the rifle. During the struggle, Huntsman tried to shoot Travis twice, but both shots missed. While Huntsman and Travis wrestled for the rifle, defendant—according to Travis's testimony at trial—approached and struck Travis twice on the back of the head with a large rock and then handed a rock to Huntsman and urged him to kill Travis. Huntsman then hit Travis in the head with the rock two or three more times.

Eventually, Travis was able to wrest the rifle from Huntsman. Travis then ran to his father and tried to administer medical care. While Travis was trying to help his father, he was hit in the face by another rock. He got up, ran to his pickup truck, and—as he was retreating—fired the rifle in the direction that the rock came from. That shot hit Huntsman and killed him.

Defendant was charged with attempted murder and second-degree assault, based on Travis's testimony that she hit him with a rock, handed the rock to Huntsman, and repeatedly urged Huntsman to kill Travis. Travis was the state's key witness. At trial, defendant presented evidence that Travis's account of what had happened changed over time from one in which defendant was hardly involved to one in which she was an active and culpable participant. The state, over defendant's objection, offered expert testimony by a police officer—Officer Kozowski—to the effect that memory of a traumatic event improves over time. On appeal, defendant argues, among other things, that the trial court erred in allowing that testimony.

As noted, Travis was the state's main witness; except for defendant, he was the only survivor of the incident. On the day that it occurred, Travis told the emergency responders, including Kozowski, that, during the struggle for control of the rifle, Huntsman hit him repeatedly with a large rock that defendant handed to him. He did not say at that time that defendant hit him with the rock; he made that allegation for the first time five days later, after retaining counsel. Further, on the day of the incident, he said nothing about defendant provoking or encouraging Huntsman; in fact, he said nothing about that subject until trial, at which time he testified that, when Huntsman was pointing the gun at Travis's father, defendant said, "Just do it"; that, when Huntsman and Travis were wrestling for the rifle, defendant told Huntsman, "[H]ere's a rock. Hit him in the head. Kill him. Kill that fucker, too"; and that, during the fight, Travis asked Huntsman why he was acting as he was, and Huntsman replied, "She told me to," indicating defendant.

Defendant attempted to cast doubt on Travis's version of events by emphasizing that his story changed after the fact, after visiting the scene of the incident with police officers and his lawyer. The state called Kozowski as a witness to testify as an expert that, as time passes after a traumatic event, a person's memory of the event improves. Defendant objected, arguing that Kozowski was not qualified as an expert under OEC 702.[2]

In the state's offer of proof, Kozowski explained his experience:

"As the Department firearms instructor, one of the things that concerns me is if one of our officers gets into a use of force situation, especially regarding the use of firearms, not only do I work on [t]eaching [t]he fundamentals of shooting a firearm but then what they need to be prepared [for] after the fact of if you do have to use your firearm in the line of duty, you know, what to expect, both physiologically,

---

[2] OEC 702 provides:

"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

psychologically, based on research from various sources indicate it likely to happen, and then, also, legally from the standpoint of what you can expect to happen in that regard.

"I've done quite a bit of research not only because of my position as a firearms instructor but, also, personally so I know if I'm in that situation what to expect, what types of things are going to happen.

"I've read a lot—a number of things researched by a noted expert in the field[ ] Lieutenant Colonel Dave Grossman, an Army psychologist, who, basically, that's all he does anymore is talk about the aftereffects of deadly force encounters. I've also read quite a bit of literature from an organization called the Force Science Research Institute. Again, their focus is on deadly force encounters by police officers, kind of pre- and post-encounter, with a lot of emphasis on what officers can expect, you know, what a natural reaction is going to be after you're involved in that type of situation.

"I've also studied the County's deadly force plan. There's a state-mandated plan on how the organizations in a county, including the law enforcement agencies and the District Attorney's office, respond to an officer-involved shooting or other deadly force encounter, number one, to make sure that it had in there things that I felt were important to insure that an officer that is involved in a deadly force encounter gets a fair shake, essentially, so they're not being asked to do things at an inappropriate time."

The court allowed Kozowski to testify that, based on his research and his personal experience, "memory[ ] recall of what happened during [a traumatic] event improves with time as you get away from the event." Additionally, he testified that this phenomenon applies both to police officers and military personnel, as well as civilians, and that, because of this research, it was Wallowa County's policy not to interview police officers who had been in deadly force encounters until at least 48 hours had passed.

On appeal, defendant renews her argument that Kozowski did not qualify as an expert witness.[3] Defendant

---

[3] Defendant also argues on appeal that the subject of Kozowski's testimony—memory recall after a traumatic incident—is scientific evidence for which the state did not lay an adequate foundation. The state responds that defendant did not

and the state disagree as to the appropriate standard of review. Defendant argues that we review for errors of law, citing *State v. Rogers*, 330 Or 282, 315, 4 P3d 1261 (2000), where the court held, "[T]his court reviews without deference for errors of law whether a trial court properly applied OEC 702 to decide whether an expert is qualified to give testimony *relative to a particular topic*, because that determination is a question of the application of law." (Emphasis in original.) The state, for its part, argues that we review for abuse of discretion, citing *State v. Park*, 140 Or App 507, 514, 916 P2d 334, *rev den*, 323 Or 690 (1996): "[The d]efendant argues that the witness was not qualified to testify as an expert * * * because he lacked a degree in botany. OEC 702. We review the court's ruling for abuse of discretion."

We agree with defendant, although the question is not without its complexities. In discussing the appropriate standard of review under OEC 702, the court in *Rogers* began by noting that the state cited cases supporting abuse of discretion, while defendant cited other cases supporting review for errors of law; the court then stated, "Both parties are partially correct, because the determination whether an expert witness is qualified to testify may involve both the application of legal rules and the exercise of a trial court's discretion." *Rogers*, 330 Or at 310. Thus, the court clearly implied that some issues involved in determining the admissibility of expert testimony *are* reviewed for abuse of discretion. The opinion, however, does not say which questions those are.

Further, in announcing the holding, the court italicized one phrase: "[T]his court reviews without deference for errors of law whether a trial court properly applied OEC 702 to decide whether an expert is qualified to give testimony *relative to a particular topic * * *." Id.* at 315 (emphasis in original). That emphasis would seem to imply that the question of a witness's expertise is separate from the question of the scope of that expertise, and only the latter is reviewed for legal error. Moreover, in *Yundt v. D & D Bowl, Inc.*, 259 Or 247, 486 P2d 553 (1971)—a case that the *Rogers* court quoted

---

preserve that argument for appeal. We agree with the state, and we do not address that argument. Further, defendant did not argue that Kozowski's testimony amounted to vouching for the credibility of a witness, and we therefore do not address that issue either.

at length—the court wrote, regarding the assertion that the proper standard of review was for abuse of discretion:

> "However, this cannot be the meaning of the term 'discretion' when a judge is faced with a decision whether to admit certain testimony of an expert after he has been deemed qualified. At this point, he must apply certain principles of law to his decision and he is not free of revision or review."

*Rogers*, 330 Or at 311 (quoting *Yundt*, 259 Or at 256). The implication of this quotation is that the decision to admit particular testimony occurs only after the decision to deem a person qualified as an expert, and only the former decision is reviewed for legal error. One plausible interpretation of *Rogers*, then, is that the admissibility of expert testimony involves two separate inquiries. The first is whether the witness has qualifications that make him or her an expert, that is, a person whose "specialized knowledge," OEC 702, distinguishes him or her from ordinary triers of fact. The second is whether the specialized knowledge encompasses the "particular topic," *Rogers*, 330 Or at 315, on which the expert is to testify. The first question is reviewed for abuse of discretion; the second is reviewed for legal error.

While that interpretation of *Rogers* is plausible, it is not tenable. The distinction between a witness's qualification as an expert and his or her qualification to offer expert testimony on a particular subject is often blurred in the particular case and is generally a matter of semantics and not of substance; the question whether a witness is a qualified expert, and if so, whether the expertise extends to the particular topic at hand, is usually phrased as the single question of whether the witness is qualified to testify on the topic. And even if there might be a distinction between the two questions, we can perceive no reason why they should entail different standards of review. Perhaps for these reasons, our cases since *Rogers* have consistently applied the legal error standard in reviewing the admissibility of expert testimony. *E.g.*, *Fedorov and Fedorov*, 228 Or App 50, 60-61, 206 P3d 1124, *rev den*, 347 Or 42 (2009); *State v. Warren*, 224 Or App 204, 211, 197 P3d 605 (2008). We therefore turn to the question whether Kozowski qualified as an expert on memory following traumatic events, and we review the court's

determination that he was so qualified for legal error. Under that standard, we conclude that the court erred.

In the state's offer of proof and during his testimony, Kozowski presented the following facts as the basis of his expertise to testify on memory after traumatic events:

- As the department firearms instructor, he taught students what they could expect to experience psychologically after a use of force situation.

- He read "a number of things" by Lieutenant Colonel Dave Grossman, an Army psychologist and "noted expert in the field."

- He read "quite a bit of literature from an organization called the Force Science Institute" focusing on what police officers might experience after a deadly force encounter.

- He read other unspecified "publications on memory."

- He was aware of Oregon and Wallowa County policies that called for letting at least 48 hours pass before interviewing a police officer who had been involved in a deadly force encounter.

- On one occasion two years before trial, he "had an opportunity to talk to an officer shortly after he was involved in a deadly-force incident just to * * * verify some of the things I had researched earlier * * *."

- He relied on other unspecified "multiple sources" and "independent interviews of people."

- He recalled his "own personal experience" as a Marine in Desert Storm, where he obtained "personal knowledge of those things."

We find several of these facts to be irrelevant, particularly his personal recollections and informal conversations, which are not detailed or extensive enough to constitute relevant experience on memory loss. His teaching experience likewise means little without some indication of what he taught and how he learned it, particularly in light of his acknowledgement that he was not qualified to teach about memory recall. He also acknowledged that he had no formal training in the

subject about which he was to testify as an expert, had written no books or articles, and had passed no qualifying exam. In the final analysis, his expertise derived from reading some material by one author and one institute and from familiarity with one or two public documents. That is not the stuff of expertise; if it were, any literate person with access to a library or an Internet connection could become an expert in anything over one long weekend. Our standards are higher.[4] Allowing Kozowski to testify as an expert on the subject of memory after traumatic events was error.[5]

Evidentiary error does not require reversal unless it is prejudicial. OEC 103(1). We will therefore affirm a judgment despite evidentiary error if there is "little likelihood that the particular error affected the verdict[.]" *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). In making that determination, we consider the possible influence of the error on the verdict that the jury rendered. *Id.* In this case, each of the only two survivors of the incident presented starkly conflicting accounts of the events leading to the prosecution of defendant. Each account had its inherent inconsistencies and logical improbabilities. Among the most prominent weaknesses in the state's case was its witness's shifting account of the events, which changed from an account rendered at the time of the incident that mentioned defendant only in passing, to a later account that seriously implicated her. That weakness was at least partly eliminated—or at least lessened—by Kozowski's testimony, which gave an "expert's"

---

[4] Thus, for example, in *State v. McFarland*, 221 Or App 567, 572, 191 P3d 754 (2008), we held that an officer was not qualified to testify about the drug recognition protocol despite the fact that

"(1) he was a trainee in DRE [drug recognition expert] protocol; (2) he had completed the classroom portion of the training; (3) he had conducted more than the minimum number of supervised evaluations required for certification; however, (4) he had neither taken and passed the final written test nor completed the necessary paperwork for certification; and (5) he had conferred with Selby, his DRE training officer, at the end of defendant's DRE protocol."

[5] The issue of Kozowski's testimony was presented at trial, and again on appeal, purely as a question under OEC 702 and not as a question of whether Kozowski's "training and experience" in general rendered his testimony admissible. We do not address that question. *See State v. Daniels*, 234 Or App 533, 542, 228 P3d 695, *rev den*, 349 Or 171 (2010) (as officer's testimony based on training and experience becomes more esoteric, specialized, counterintuitive, or scientific, increasingly persuasive explanation is necessary).

imprimatur to the counterintuitive proposition that a person's memory improves over time. On this record, we are unable to conclude that there was little likelihood that his testimony affected the verdict. We must therefore reverse and remand.

Because the issue may arise on remand, we briefly address defendant's first assignment of error. She argues that "the trial court erred in prohibiting [her] from questioning [Travis] about his probation status" in Idaho for a 2008 conviction on charges of assault. Relying on *State v. Shelly*, 212 Or App 65, 157 P3d 234 (2007), defendant argued that Travis's probationary status was relevant to show that he might have changed his story in order to curry favor with the prosecution. In *Shelly*, the trial court refused to allow the defendant to question the witness about whether he was currently on probation and had recently violated its terms. We reversed the trial court, concluding that

> "[e]vidence that a person is on probation and at risk of having that probation revoked is generally relevant to that person's credibility when he or she testifies for the prosecution in a criminal case, except, perhaps, in extraordinary circumstances not present here (for example, if the term of probation was due to expire very shortly after the trial). In *State v. Weinstein*, 108 Or App 486, 487, 814 P2d 565 (1991), we agreed with the state's concession that the trial court erred in not allowing the defendant to impeach the state's witness by eliciting on cross-examination evidence that the witness was on probation; the evidence showed bias, because the witness had a motive to lie to avoid having his probation revoked."

*Id.* at 68-69.

We agree with the state that this case presents distinguishable facts. Here, there was no evidence that Travis was in violation of his probation or at risk of becoming so; he had one or two conditions to fulfill before his term of probation ended, but there was no evidence that he would have been unwilling or unable to fulfill them. Further, even if we assume that he was in violation or at risk of becoming so, there was no evidence that currying favor with Wallowa County prosecutors could have any effect on matters in Idaho, a completely different jurisdiction. The trial court did

not err in prohibiting defendant from inquiring into Travis's probation status.[6]

Reversed and remanded.

---

[6] In a third assignment of error, defendant argues that the court erred in not permitting her to cross-examine Travis about two criminal convictions for assault and battery. We conclude that defendant did not adequately object to the trial court's ruling, and that, in any event, the evidence of the convictions ultimately *was* admitted, albeit not on cross-examination.