Argued and submitted January 18; remanded for resentencing, otherwise affirmed April 27; on appellant's petition for reconsideration filed May 23, reconsideration allowed by opinion July 27, 2022
See 321 Or App 79, 515 P3d 402 (2022)

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# KENNETH SHERIDAN WAGNER,
*Defendant-Appellant.*

## Lincoln County Circuit Court
19CR68935; A173918

509 P3d 731

Defendant appeals from a judgment of conviction for multiple offenses, including second-degree assault, strangulation, fourth-degree assault, and menacing. In his first through fourth assignments of error, he challenges the trial court's ruling that a detective had the requisite expertise to testify about physical aspects of strangulation and cycles of domestic violence. In his fifth assignment of error, defendant challenges the trial court's denial of his motion for judgment of acquittal on second-degree assault, arguing that no rational trier of fact could conclude that a pillow constitutes a dangerous weapon. In his sixth assignment of error, defendant challenges the trial court's instruction to the jury that it could reach nonunanimous verdicts. In his seventh assignment of error, defendant argues that the trial court committed plain error in imposing a sentence on his second-degree assault conviction that exceeds the statutory maximum sentence. *Held*: First, the Court of Appeals concluded that the detective was qualified to offer expert testimony under OEC 702 in this case. Second, the court held that the trial court did not err in denying defendant's motion for judgment of acquittal, concluding that the evidence would permit a rational trier of fact to find that the pillow was a dangerous weapon. Third, the court rejected defendant's sixth assignment of error because the jury returned unanimous guilty verdicts on all counts. Lastly, the court accepted the state's concession that the trial court plainly erred in imposing a sentence on defendant's second-degree assault conviction that exceeded the statutory maximum sentence.

Remanded for resentencing; otherwise affirmed.

Thomas O. Branford, Judge.

Laura A. Frikert, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Greg Rios, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Mooney, Presiding Judge, and Joyce, Judge, and Hadlock, Judge pro tempore.*

JOYCE, J.

Remanded for resentencing; otherwise affirmed.

_____
* Joyce, J., *vice* DeHoog, J. pro tempore.

**JOYCE, J.**

Defendant appeals from a judgment of conviction for multiple offenses, including second-degree assault, strangulation, fourth-degree assault, and menacing. Defendant's convictions stem from his repeated assaults on his domestic partner, including an incident in which defendant put a pillow over her face and also strangled her. In several combined assignments of error, he challenges the trial court's ruling that a detective had the requisite expertise to testify about physical aspects of strangulation and cycles of domestic violence. In his fifth assignment of error, defendant challenges the trial court's denial of his motion for judgment of acquittal on the second-degree assault charge, arguing that no rational trier of fact could conclude that a pillow constitutes a dangerous weapon. In his sixth assignment of error, defendant challenges the trial court's instruction to the jury that it could reach nonunanimous verdicts. In his seventh assignment of error, defendant argues that the trial court committed plain error in imposing a sentence on his second-degree assault conviction that exceeds the statutory maximum sentence. We agree that the trial court erred in imposing sentence on defendant's second-degree assault conviction and remand for resentencing. Otherwise, we affirm.

## CHALLENGE TO TRIAL COURT'S RULING ON EXPERT TESTIMONY

In his first through fourth assignments of error, defendant challenges the trial court's conclusion that an investigating detective could offer expert testimony about two categories of evidence: (1) the physical signs and symptoms of strangulation and (2) the cycle of domestic violence and "counterintuitive" victim behavior. We review for legal error, *see State v. Brown*, 294 Or App 61, 62, 430 P3d 160 (2018), and affirm.

We begin by summarizing all the evidence relevant to the trial court's admission of expert testimony under OEC 702. *Id.* The victim and defendant were in a relationship. The victim reported several incidents of domestic violence. In one incident, the victim was at defendant's home and they got into an argument after defendant accused the victim of

having an affair. At some point, defendant shoved the vic-
tim's face into her sweatshirt while he held the back of her
head, which impaired her breathing. During that incident,
the victim urinated. She recalled then being on her back on
a bed and defendant placing a pillow over her face. She felt
like she was going to die and she urinated again. The phone
rang and defendant left to answer it, allowing the victim to
escape and leave the house.

When she returned to her home, the victim's sister-
in-law became concerned because the victim's memory
appeared to be impaired. She called an ambulance and the
victim went to the hospital. Detective Dorsey interviewed
the victim at the hospital, and she disclosed several addi-
tional incidents in which defendant assaulted her. The
victim described an incident where defendant pinned her
down on her bed while telling the victim's three children
that he was going to kill them. She was able to get up, at
which point defendant then pinned her down in the living
room.

In another incident, defendant grabbed her by the
throat and shoved her backwards. The victim was not able
to breathe normally when he first grabbed her neck. The
victim also described an assault that occurred when the
victim tried to end their relationship. Defendant grabbed
the victim and pushed his thumb into her neck, impairing
the victim's ability to breathe. After that assault, the victim
could not swallow without pain.

The day after her hospitalization and interview
with Dorsey, the victim's eyelids were bruised, her lip was
cut, she had bruises on her arms, the back of her neck was
swollen, and she had bruises on the front of her neck. She
could not move her head without pain and was unable to eat.

As a result of the series of assaults, the state charged
defendant with a number of crimes. Before trial, the state
filed two memorandums, asking the trial court to allow
Dorsey to provide expert testimony (1) that strangulation
frequently occurs without bruising and (2) that urination
is a common psychological response to strangulation. The
state also sought to have the detective testify about cycles of
domestic violence and "counterintuitive victim behavior."

At a hearing on the question of Dorsey's expert qualifications, Dorsey testified about her background, training, and expertise. That testimony included the following. Dorsey has worked in law enforcement for 22 years and has been a detective for eight of those. To become a law enforcement officer, Dorsey attended the corrections academy and a police academy. Over the course of her career, she has attended over 2100 hours of law enforcement training. She has specialized training in assault, rape, and investigations, among other things.

Dorsey has also attended conferences and obtained specialized training in fatal and nonfatal strangulation and wound identification, as well as "pattern injuries and mechanism of injuries." She estimated that she has attended 15 or 16 trainings on the topics of domestic violence and strangulation. The training on strangulation included the signs and symptoms of strangulation.

She also has served as a deputy medical examiner for four years, which required specialized training in death investigations.[1] Dorsey attended a week-long course at the State Medical Examiner's Office and then passed a test, followed by an externship at the State Medical Examiner's Office. She then became certified in her county, which required undergoing practical exams with the county medical examiner. She has to attend 12 hours of training a year and performs case reviews every month. As a deputy medical examiner, she has examined approximately 250 bodies, 25 to 30 of which have involved strangulation and asphyxiation.

---

[1] We note that the role and duties of medical examiner and deputy medical examiner are regulated by statute. *See* ORS 146.003 to 146.125. A medical examiner may appoint a deputy state medical examiner as well as district medical examiners. ORS 146.045(1), (2). Both are required to be physicians. ORS 146.003(2), (5). In contrast, a medical-legal death investigator is a person appointed by the district medical examiner to assist in death investigations; that person does not have to be a physician and can be a peace officer. ORS 146.085(1). The medical-legal death investigator cannot certify the cause or manner of death. ORS 146.085(6). Notwithstanding the apparent differences between deputy/district medical examiners and medical-legal death investigators, and notwithstanding the absence of evidence in the record that Dorsey is a physician and therefore cannot by statute serve as a deputy medical examiner, no party made that distinction below.

Dorsey testified that strangulation is well understood by law enforcement and deputy medical examiners. Dorsey has reviewed research about the physiology of strangulation, how it occurs, and what it does to the victim's body. In the course of her career, Dorsey has investigated cases of nonfatal strangulation and has seen the signs and symptoms of it.

Dorsey also has specialized training in domestic violence investigations and in her 22 years of experience, she has responded to "probably" 400 domestic violence cases. She has reviewed research in the area of domestic violence and that research is discussed at the various trainings that she has attended, including training on "the cycle of domestic violence" and "the way that victims behave."

After hearing Dorsey's qualifications, the trial court ruled that Dorsey could testify as an expert on particular matters. More specifically, the court ruled that Dorsey could testify about the cycle of violence and counterintuitive victim behaviors. The court also ruled that Dorsey could testify about the absence of physical evidence of strangulation and that urination can be a sign or symptom of strangulation.

During defendant's jury trial, Dorsey testified to her training and experience with strangulation and domestic violence. Dorsey testified that strangulation blocks oxygen from getting to the brain and can cause a loss of consciousness. Some of the signs of strangulation are physical and include petechia and bruising. Other signs are not visible, including dizziness, nausea, and urination. She explained that she has personally observed deceased victims who have urinated or defecated after being strangled and that it occurs because the brain is deprived of oxygen, causing the muscles that control those bodily functions to relax. Dorsey testified that she has investigated nonfatal strangulation cases where the victim urinated or defecated and that when someone urinates, that victim is as close to death as the victim can get, without actually dying. Not every victim shows the same signs and Dorsey explained that it is possible that some victims may not have any visible signs

of strangulation, in part because the neck is primarily soft tissue.

Dorsey also described the cycle of violence and testified that the most dangerous time in a violent relationship is when the victim tries to leave. She testified that many domestic violence victims demonstrate "counterintuitive behaviors," including minimizing the abuse, delaying reporting, and remaining with and/or returning to the abuser.

As noted, defendant argues on appeal that the trial court erred in allowing Dorsey to testify that strangulation often occurs without bruising and that urination is a common psychological response to strangulation that is caused by lack of oxygen to the brain. He also contends that the court erred in allowing Dorsey to testify about the cycle of domestic violence and counterintuitive victim behavior. We disagree.

OEC 702 allows a "witness qualified as an expert by knowledge, skill, experience, training or education" to testify to "scientific, technical or other specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue." Whether a witness is qualified to testify as an expert is relative to the topic about which the witness is asked to testify. *State v. Wendt*, 294 Or App 621, 625, 432 P3d 367 (2018). We focus on "the knowledge of the expert, rather than the expert's particular medical degree or specialty, when examining the qualifications of medical experts[.]" *Trees v. Ordonez*, 354 Or 197, 210, 311 P3d 848 (2013). Relatedly, a witness does not need to have a particular education or degree to qualify as an expert. *State v. Rogers*, 330 Or 282, 316, 4 P3d 1261 (2000). Rather, a witness testifying as an expert needs to have "the necessary skill and knowledge to arrive at an intelligent conclusion about the subject matter in dispute." *Burton v. Rogue Valley Medical Center*, 122 Or App 22, 26, 856 P3d 639, *rev den*, 318 Or 24 (1993).

Dorsey's training and experience qualified her to (as the state describes) "explain the relatively straightforward concepts" that "visible bruising" is not always present

after strangulation and that it is "not uncommon for a person being strangled to urinate involuntarily."[2] To recap, Dorsey:

- Has worked in law enforcement for 22 years;

- Has attended over 2100 hours of training;

- Has attended 15 to 16 trainings on the topics of domestic violence and strangulation, including training on the signs and symptoms of strangulation;

- Has reviewed research on the physiology of strangulation, including what it does to the victim's body;

- Has investigated cases of nonfatal strangulation and has seen the signs and symptoms of it;

- Is a deputy medical examiner, which required education, followed by a test and an externship, as well as practical training and on-going educational requirements;

- In her role as a deputy medical examiner, has examined 25 to 30 bodies of individuals who suffered fatal strangulation and asphyxiation.

That experience, education, and training reflects that Dorsey has the "skills and knowledge" that a strangulation victim may not always show bruising and that she might urinate in the process of being strangled. Her experience with victims who have survived strangulation, as well as with those who have not, allows her to know the physical symptoms (visible or otherwise) of strangulation, including bruising (or the absence of it) and urination. She has reviewed research on the physiology of strangulation, which, in tandem with her experience and training, would allow her to explain to the jury that bruising might not occur because the neck has soft tissue.

---

[2] On appeal, defendant does not contend that Dorsey's testimony should be subject to the rigors of analysis set forth in *State v. Brown*, 297 Or 404, 687 P2d 751 (1984) and *State v. O'Key*, 321 Or 285, 899 P2d 663 (1995), concerning scientific validity and reliability. We thus do not decide whether Dorsey's testimony was "scientific" or whether, if it was, she was qualified to testify specifically about the scientific validity of the assertions she made. Our opinion should be read with that in mind.

Thus, this case is distinguishable from the cases upon which defendant relies. In *State v. Dunning*, 245 Or App 582, 590-91, 263 P3d 372 (2011), the police firearm instructor's self-study on memory recall did not qualify him as an expert on memory recall after traumatic events, where purported expertise derived from "reading some material by one author and one institute and from familiarity with one or two public documents." Similarly, in *State v. Ohotto*, 261 Or App 70, 323 P3d 306 (2014), we concluded that an officer was not qualified to provide expert testimony about alcohol absorption and elimination rates. The officer's knowledge on the subject came from experience, conducting routine DUII investigations, reading the National Highway Traffic Safety Association (NHTSA) manual, and attending an NHTSA course. *Id.* at 75 n 5, 76. But because the testimony "required a complex understanding of how [the] defendant's BAC would have changed over time" and a "formulaic calculation derived from scientific understandings of physiological processes," the officer's training and experience was not "the stuff of expertise." *Id.* at 76 (internal quotation marks omitted).

Dorsey's training and experience is more expansive than that in *Dunning* and *Ohotto*, both in volume and specificity to the subject upon which she was called to testify. Additionally, the testimony here did not involve complex scientific calculations; to the extent that what Dorsey was testifying about had some basis in science, she had the concomitant training to testify as an expert on it. Based on this record, we reject defendant's suggestion that Dorsey's education, training, and experience requires us to speculate that she had sufficient expertise to testify about strangulation in this case.

We reach the same result with respect to Dorsey's testimony about the cycle of domestic violence and that victims of domestic violence may engage in "counterintuitive behavior." Before explaining why, we briefly address the state's argument that defendant failed to preserve his claim of error. The state asserts that defendant expressly told the trial court that he was not challenging Dorsey's expertise on those subjects. The state relies on a statement that defendant's counsel made, indicating that he was "not objecting to

[Dorsey's] expertise in domestic violence." But the full statement of counsel was, "I don't want to, I don't want to preface this as I'm not concerned or I'm not objecting to her experience in domestic violence." Counsel later stated that "to a lesser degree, I'm still objecting to her testifying, uh, taking off her hat as the lead investigating officer and putting on her hat as a domestic violence expert."

In the particular context in which they were made, those objections were sufficient to preserve the claim of error that defendant now makes on appeal. As defendant notes, the rule of preservation is intended to ensure that the parties and the trial court are not taken by surprise and to allow the trial court to identify and correct any error. *Peeples v. Lampert*, 345 Or 209, 219, 191 P3d 637 (2008). Those purposes are satisfied here. The state filed a motion to qualify Dorsey as an expert on domestic violence and put on evidence designed to demonstrate why Dorsey qualified as an expert and the trial court specifically ruled on it. Although defendant's argument was brief, both parties and the court understood the issue, the legal and factual bases, and no one can claim to be surprised on appeal by the argument.

On the merits, we conclude that the trial court correctly determined that Dorsey had sufficient training and experience to testify about counterintuitive victim behavior and cycles of violence. In her 22 years of experience, Dorsey has investigated over 400 domestic violence cases and has attended 15 to 16 trainings specifically on the topic of domestic violence. The trainings have included discussion of research on the cycles of domestic violence and how victims behave. Dorsey has also reviewed that research. That experience qualified Dorsey as an expert and the trial court correctly concluded as much.

## CHALLENGE TO DENIAL OF MOTION FOR JUDGMENT OF ACQUITTAL

In his fifth assignment of error, defendant argues that the trial court erred in denying his motion for judgment of acquittal on second-degree assault. Second-degree assault requires that the defendant caused physical injury by means of a "dangerous weapon[,]" ORS 163.175, here, a

pillow. A dangerous weapon is "any weapon, device, instrument, material or substance which under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or serious physical injury." ORS 161.015(1). A "serious physical injury" is in turn one that "creates a substantial risk of death, * * * protracted impairment of health or protracted loss or impairment of the function of any bodily organ." ORS 161.015(8).

In light of those elements, the state was required to prove that the pillow was a dangerous weapon that was readily capable of causing death or serious physical injury. The trial court denied defendant's motion, concluding that the evidence would permit a trier of fact to conclude that the pillow was a dangerous weapon that impeded the victim's breathing. We review to determine whether, viewing the evidence in the light most favorable to the state, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, *State v. Hedgpeth*, 365 Or 724, 730, 452 P3d 948 (2019), and affirm.

The victim repeatedly testified that defendant put a pillow "over" her face when she was on her back on a bed. She could not breathe and felt like she was going to die. She struggled with defendant, trying to get the pillow off her face. During the incident, the victim urinated involuntarily. Dorsey testified that obstructing a person's airway can cause a person to lose consciousness and can cause involuntary urination. She also testified that obstructing the function of breathing can be fatal.

That evidence would allow a rational trier of fact to conclude that the pillow that defendant used to smother the victim was a dangerous weapon that was capable of causing death or serious physical injury, namely the impairment of the victim's ability to breathe. As the trial court observed, the victim's repeated descriptions of the pillow being placed "over" her face would allow a jury to conclude that the pillow was large enough to cover the victim's face. The pillow prevented her from breathing and the state offered testimony that not being able to breathe can be fatal. Consistent with being smothered, the victim also suffered a physical symptom of involuntary urination.

Defendant argues that the state failed to offer evidence of the specific characteristics of the weapon or opinion evidence on the dangerousness of the weapon. Defendant analogizes the pillow here to the tennis shoe in *State v. Werder*, 112 Or App 179, 182, 828 P2d 474 (1992). There, we observed that the record was devoid of evidence about what role the shoes played in the victim's injuries: the state did not put the shoes, photographs, or descriptions of the shoes, into evidence, nor did the state offer evidence that the victim's injuries were caused by a shoe. *Id.* We thus concluded that a tennis shoe was not a dangerous weapon as there was no evidence that the defendant's "aggressive use of his tennis shoed feet" could have resulted in an injury different from a bare foot. *Id.*

To be sure, there are some similarities between this case and *Werder*, inasmuch as the state here did not offer the pillow or photographs of the pillow into evidence. But as the trial court explained in distinguishing *Werder*, "[defendant] wasn't walking around with a pillow like Mr. Werder was walking around with shoes on. He picked the pillow for a reason, because it would do a better job of * * * smothering her mouth and nose than his bare hand would. * * * [T]here is sufficient circumstantial evidence about the pillow, that it was big enough and pliable enough to, uh, impede her breathing better than [defendant] could have done with his bare hand[.]" Those distinctions make for a different outcome in this case and we conclude that the trial court properly denied defendant's motion for judgment of acquittal.

## CHALLENGE TO NONUNANIMOUS
## JURY INSTRUCTION

In his sixth assignment of error, defendant asserts that the trial court erred in instructing the jury that it could reach a nonunanimous verdict. Defendant is not entitled to reversal of any convictions that were based on unanimous guilty verdicts. *See State v. Flores Ramos*, 367 Or 292, 334, 478 P3d 515 (2020) (where a jury poll showed that the verdict was unanimous, any error in instructing the jury that it could reach nonunanimous guilty verdicts was harmless and did not amount to structural error). Because the jury

returned unanimous guilty verdicts on all counts, we reject this assignment of error.

## CHALLENGE TO SENTENCE ON SECOND-DEGREE ASSULT CONVICTION

In his seventh assignment of error, defendant challenges his sentence on his second-degree assault conviction, Count 1. The trial court sentenced defendant to 120 months of prison and 36 months of post-prison supervision. In an unpreserved claim of error, defendant contends that his sentence was unlawful because the 120-month prison sentence, when combined with the 36-month post-prison supervision term, exceeds the 120-month maximum sentence for the crime. ORS 161.605(2); OAR 213-005-0002(4). He asks that we review the error as plain in light of previous cases in which we have reviewed similar claims as plain error. *See, e.g.*, *State v. Evans*, 281 Or App 771, 772, 383 P3d 444 (2016), *rev den*, 360 Or 752 (2017). The state concedes the error and agrees that we should exercise our discretion to correct the plain error.

We agree and accept the state's concession and, for the reasons expressed in *Evans*, *id.* at 773, we exercise our discretion to correct the error, as we have on previous occasions. We therefore remand for resentencing.

Remanded for resentencing; otherwise affirmed.